**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| NATIONAL COLLEGIATE | : | |
| ATHLETIC ASSOCIATION, | : | |
|     **Plaintiff** | : | |
| | : | **No. 1:13-cv-00457** |
| v. | : | |
| | : | **(Judge Kane)** |
| THOMAS W. CORBETT, JR., in his | : | |
| capacity as Governor of the Commonwealth | : | |
| of Pennsylvania, et al., | : | |
|     **Defendants** | : | |

**MEMORANDUM**

Before the Court are Defendants Governor Thomas Corbett and Chairman of the

Pennsylvania Commission on Crime and Delinquency Mark R. Zimmer (Doc. No. 17), Treasurer

Rob McCord (Doc. No. 18), and Auditor General Eugene DePasquale's (Doc. No. 19) motions to

dismiss or stay Plaintiff National Collegiate Athletic Association's complaint.  The motions have

been fully briefed and are ripe for disposition.  For the reasons that follow, the Court will deny

Defendants' motions to dismiss or stay the case.

**I.      BACKGROUND**

Plaintiff, the National Collegiate Athletic Association ("NCAA"), brings this

constitutional challenge to a 2013 enactment of the Pennsylvania General Assembly, alleging that

the statute violates the United States Constitution.  The facts alleged in support of Plaintiff's

complaint are all too familiar.  Plaintiff is a voluntary association of higher education institutions

that regulates intercollegiate athletic competition and enforces uniform rules for the

administration of intercollegiate athletics.  (Doc. No. 1 ¶ 10.)  As a member institution,

Pennsylvania State University ("Penn State") is subject to the NCAA's constitution and bylaws.

(Id. ¶¶ 21, 23, 28.)  On November 4, 2011, after a grand jury investigation into allegations that former Penn State assistant football coach Gerald A. Sandusky sexually abused children for over a decade, Sandusky was criminally charged.  (Id. ¶ 29; Doc. No. 23 at 7.)  That same day, charges were brought against senior Penn State officials for failing to report the allegations of abuse and for committing perjury before the grand jury; these officials included Penn State Athletic Director Timothy M. Curley and Penn State Senior Vice-President of Finance and Business Gary C. Schultz.  (Doc. No. 1 ¶ 32.)

Shortly after the criminal charges were filed against various Penn State officials, Plaintiff began evaluating whether Penn State's conduct had violated any NCAA rules.  (Id. ¶ 37.) Following Plaintiff's investigation, Penn State entered into a consent decree with Plaintiff on July 23, 2012.  (Id. ¶ 38.)  As part of the consent decree, Penn State agreed to pay a $60 million fine over five years into an endowment for programs devoted to preventing child sexual abuse or to assisting the victims of such abuse.  (Id. ¶ 42; Doc. No. 14-1 at 6.)  On or about September 18, 2012, Plaintiff appointed a task force to oversee the creation of the endowment funded by the $60 million fine.  (Doc. No. 1 ¶ 45.)  Members of the task force include the Dean of the College of Health and Human Development at Penn State, the Vice Dean for Clinical Affairs at the Penn State College of Medicine, and individuals from national non-profit organizations, the federal government, and the NCAA.  (Id.)  The task force established that "[a]ll funds from the fine will follow the endowment guidelines established by the Child Sexual Abuse Endowment Task Force and flow to programs designed to prevent child sexual abuse or assist the victims of child sexual abuse nationwide."  (Id. ¶ 47.)  To date, Penn State has paid $12 million into an account scheduled to be transferred into the endowment.  (Id. ¶ 48; Doc. No. 14-2.)

2

### B.     Defendant Governor Corbett's antitrust action

On January 2, 2013, Governor Corbett, on behalf of the Commonwealth, filed an antitrust

action against the NCAA in this Court, alleging that NCAA President Dr. Mark Emmert, the

NCAA Executive Committee, and Division I Board of Directors participated in an unlawful

antitrust conspiracy designed to destroy Penn State as an athletic competitor and cause a

cascading economic fallout throughout Pennsylvania.  On June 6, 2013, this Court granted the

NCAA's motion to dismiss Governor Corbett's complaint, finding that the Governor's complaint

failed to sufficiently allege: (1) commercial activity subject to the Sherman Act; (2) that the

NCAA's imposition of the sanctions against Penn State constituted a violation of Section 1 of the

Sherman Act; and (3) that the Commonwealth suffered an antitrust injury.  See Pennsylvania v.

Nat'l Collegiate Athletic Ass'n, 948 F. Supp. 2d 416 (M.D. Pa. 2013).

### C.     State Senator Jake Corman's Commonwealth Court lawsuit and further proceedings in Commonwealth Court

On December 28, 2012, Senator Jake Corman, a State Senator from the 34th Senatorial

District of Pennsylvania and the Chair of the Senate Committee on Appropriations, circulated a

memorandum to other state senators entitled "NCAA Fine Endowment for Pennsylvania."  (Doc.

No. 1 ¶ 51; Doc. No. 14 at 3-4.)  In the memorandum, Senator Corman stated that he planned to

introduce legislation to direct funds from penalties placed on Commonwealth-supported

institutions of higher education to Commonwealth causes and that "state policy should require

the money be distributed for the benefit of the state and its residents."  (Doc. No. 1 ¶ 52; Doc.

No. 1-3 at 2.)  Senator Corman further stated in the memorandum that the proposed legislation

"seeks to impact the $60 million financial penalties placed upon the Penn State University."

(Doc. No. 1 ¶ 52; Doc. No. 1-3 at 2.)

Prior to the enactment of the legislation envisioned in his memorandum, Senator Corman

commenced an action against the NCAA in the Commonwealth Court of Pennsylvania on

January 4, 2013, seeking declaratory and equitable relief to ensure that all of the funds paid into

the endowment would be used for the benefit of the Commonwealth and its residents.  (Doc. No.

14 at 1-2; Doc. No. 14-1.)  In his complaint, Senator Corman alleged that the sanctions imposed

in the consent decree violated the Pennsylvania Constitution and Pennsylvania law primarily

because the NCAA, despite intending "to wrest such a large sum of Pennsylvania funds, . . . has

refused to submit to any control by Pennsylvania elected officials." (Doc. No. 14-1.)  Three days

later, Senator Corman moved the Commonwealth Court to issue a preliminary injunction

enjoining the NCAA from "disposing of, reducing, or otherwise dissipating outside of

Pennsylvania" any of Penn State's first payment of $12 million.  (Doc. No. 14-2.)

**D.      The Endowment Act and further proceedings in Commonwealth Court**

Following Senator Corman's filing of his complaint and motion for a preliminary

injunction in the Commonwealth Court, Governor Corbett signed into law the Institution of

Higher Education Monetary Penalty Endowment Act on February 20, 2013.  See 24 P.S. § 7503

The Act provides:

> If an institution of higher education pays a monetary penalty pursuant
> to an agreement entered into with a governing body and:
>
> (1)     the monetary penalty is at least $10,000,000 in
>         installments over a time period in excess of one year;
>         and
>
> (2)     the agreement provides that the monetary penalty will
>         be used for a specific purpose,
>
> then the monetary penalty shall be deposited into an endowment that
> complies with the provisions of subsection (b).

4

24 P.S. § 7503(a); (Doc. No. 1 ¶ 54.)  Section 7503(b) requires that the monetary penalty be deposited into a separate trust fund in the State Treasury and, unless otherwise explicitly provided in the agreement, the funds may only be used within the Commonwealth for the benefit of Commonwealth residents.  Id. § 7503(b)(1), (4); (Doc. No. 1 ¶¶ 55, 57.)  Furthermore, Section 7503(b)(3) directs the Commission on Crime and Delinquency to "expend the money of the endowment."  Id. § 7503(b)(3); see also id. § 7502 (defining "commission"); (Doc. No. 1 ¶ 56.)  The Act is applicable "to all monetary penalties paid or payable under agreements between institutions of higher education and governing bodies regardless of the payment date."  Id. § 7505; (Doc. No. 1 ¶ 58.)

On February 7, 2013, the NCAA filed preliminary objections to Senator Corman's complaint in the Commonwealth Court.  (Doc. Nos. 14-4, 14-5.)  In its preliminary objections, the NCAA asserted that Senator Corman lacked standing to bring the action in Commonwealth Court, that the Commonwealth Court lacked jurisdiction over the action because Penn State was not a party to the action, and that the relief sought by Senator Corman was unconstitutional in that his attempt to override the consent decree would violate the Commerce Clause of the United States Constitution, as well as the Contracts and Takings Clauses of the Constitutions of the United States and Pennsylvania.  (Doc. No. 14-4.)

On February 20, 2013, the same date on which Governor Corbett signed the Endowment Act into law, Senator Corman filed an amended complaint in his pending Commonwealth Court action, alleging that the consent decree violated the Endowment Act.  (Doc. Nos. 14-6, 14-7.)  Senator Corman then renewed his motion for a preliminary injunction in the Commonwealth Court on February 26, 2013.  (Doc. No. 14-12.)  In that motion, he requested the Commonwealth

Court compel the NCAA to comply with the Endowment Act and remit Penn State's first payment of $12 million into the State Treasury.  (Doc. No. 14-13.)

The NCAA filed preliminary objections to the amended complaint on March 21, 2013, and, six days later, Senator Corman and Treasurer McCord filed a second amended complaint in the Commonwealth Court.  (Doc. No. 23 at 9; Doc. No. 23-1.)  The second amended complaint alleges that the consent decree violates the Pennsylvania Constitution and the Endowment Act. (Doc. No. 23-1.)

On September 4, 2013, the Commonwealth Court overruled the NCAA's preliminary objections.  Corman v. Nat'l Collegiate Athletic Ass'n, 74 A.3d 1149, 1171 (Pa. Cmwlth. Ct. 2013).  The NCAA then filed an Answer and New Matter on September 24, 2013, asserting that because it is "special legislation," the Endowment Act violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.  See Docket No. 1 MD 2013, at 16. The matter was fully briefed, and on April 17, 2014, the Commonwealth Court issued an opinion holding that the Endowment Act did not violate the Equal Protection Clause.  (Doc. No. 44-3 at 22.)  Additionally, the Commonwealth Court held that Penn State was an indispensable party, and joined it to the Commonwealth action.  (Id. at 32.)

### E.   Plaintiff NCAA's federal complaint

On February 20, 2013, the same date on which Governor Corbett signed the Endowment Act into law and on which Senator Corman filed his amended complaint seeking declaratory and equitable relief pursuant to the Endowment Act in the Commonwealth Court, Plaintiff instituted the above-captioned action in this Court by filing a complaint against Defendants Governor Corbett, Treasurer McCord, Chairman Zimmer, and Auditor General DePasquale.  (Doc. No. 1.)

In its complaint for declaratory and injunctive relief, Plaintiff alleges that the Endowment Act violates the Commerce and Contract Clauses of the United States Constitution as well as the Takings Clause of the Fifth Amendment to the United States Constitution.  (Id.)  On March 14, 2013, Defendants Governor Corbett and Chairman Zimmer, Treasurer McCord, and Auditor General DePasquale filed three separate motions to dismiss Plaintiff's complaint, arguing that under either the Younger, Pullman, or Colorado River abstention doctrines, the Court should abstain from exercising jurisdiction over the matter.  (Doc. Nos. 17, 18, 19.)

## II.    STANDARD OF REVIEW

Defendants move to dismiss Plaintiff's complaint on the basis of abstention under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  See 5B Wright & Miller § 1350 (stating that claims for federal abstention may be raised under Rule 12(b)(1)).  Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject-matter jurisdiction to hear a claim.  Fed. R. Civ. P. 12(b)(1).  The United States Court of Appeals for the Third Circuit has stated that "dismissal without retention of jurisdiction on abstention grounds is in the nature of a dismissal under Federal Rule of Civil Procedure 12(b)(6)."  Heritage Farms, Inc. v. Solebury Twp., 671 F.2d 743, 745 (3d Cir. 1982).  In resolving a Rule 12(b)(6) motion, a court must accept the plaintiff's factual allegations as true and construe them in the light most favorable to the plaintiff in order to determine whether the plaintiff has stated facts sufficient to state a claim for relief.  In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010); Markowitz v. Ne. Land Co., 906 F.2d 100, 103 (3d Cir. 1990).  However, a motion that challenges "the existence of subject matter jurisdiction in fact, quite apart from any pleadings," does not require a court to consider all allegations of the complaint as true because the court must weigh the evidence to ensure that it

has the power to hear the case.  Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891

(3d Cir. 1977).

Further, some courts have found that "abstention is a prudential rather than a

jurisdictional ground for dismissal" and, therefore, do "not rely upon the pleading or burden

requirements of either Rule 12(b)(1) or Rule 12(b)(6)."  See Christian Action Network v. Maine,

679 F. Supp. 2d 140, 143 n.2 (D. Me. 2010).  Here, the relevant facts in the case are not in

dispute, and the parties do not dispute the Court's ability to consider exhibits and court filings

attached to Plaintiff's complaint and Defendants' motions.  Accordingly, the applicability of Rule

12(b)(1) or Rule 12(b)(6) is not significant to the Court's resolution of Defendants' motion.

## III.   DISCUSSION

Although no Defendant has challenged this Court's jurisdiction to grant the relief Plaintiff

seeks, all Defendants urge this Court to decline Plaintiff's constitutional challenge by invoking

the exceptional doctrine of abstention.  "[F]ederal courts are obliged to decide cases within the

scope of federal jurisdiction," and have "no more right to decline the exercise of jurisdiction

which is given than to usurp that which is not given."  Sprint Commc'ns, Inc. v. Jacobs, 134

S.Ct. 584, 588, 590-91 (2013) (internal citations omitted).  When federal jurisdiction exists, "a

federal court's obligation to hear and decide a case is virtually unflagging."  Id. at 591 (internal

citations omitted).  Thus, a court should abstain only in exceptional and limited circumstances.

Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 408 (3d Cir. 2005); Hi Tech

Trans, LLC v. New Jersey, 382 F.3d 295, 303 (3d Cir. 2004).

All Defendants argue that under Younger v. Harris, 401 U.S. 37 (1971), the Court should

abstain from exercising jurisdiction in this matter.  (See Doc. No. 20 at 15; Doc. No. 21 at 15;

Doc. No. 22 at 6.)  Defendants Governor Corbett and Chairman Zimmer additionally seek

abstention under the doctrine of <u>Railroad Commission of Texas v. Pullman Company</u>, 312 U.S.

496 (1941).  (Doc. No. 20 at 21.)  Finally, Defendants Treasurer McCord and Auditor General

DePasquale seek abstention under the doctrine of <u>Colorado River Water Conservation District v.</u>

<u>United States</u>, 424 U.S. 800 (1976).  (Doc. No. 21 at 21; Doc. No. 22 at 8.)  Alternatively, all

Defendants seek a stay in this matter.  (<u>See</u> Doc. No. 20 at 24; Doc. No. 21 at 25; Doc. No. 22 at

9.)  The Court will address each argument in turn.

> A.    <u>**Younger** abstention</u>

In moving to dismiss this action, each Defendant argues that the Court should abstain

from exercising subject matter jurisdiction under the doctrine of <u>Younger v. Harris</u>.  (<u>See</u> Doc.

No. 20 at 15; Doc. No. 21 at 15; Doc. No. 22 at 6.)  <u>Younger</u> "and its progeny espouse a strong

federal policy against federal-court interference with pending state judicial proceedings absent

extraordinary circumstances."  <u>Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n</u>, 457

U.S. 423, 431 (1982); <u>see also</u> <u>Addiction Specialists</u>, 411 F.3d at 408 ("A federal district court

has discretion to abstain from exercising jurisdiction over a particular claim where resolution of

that claim in federal court would offend principles of comity by interfering with an ongoing state

proceeding.").  "Abstention from the exercise of federal jurisdiction is the exception, not the

rule."  <u>Colo. River</u>, 424 U.S. at 813.

The United States Supreme Court recently clarified the requirements for <u>Younger</u>

abstention and defined the limited circumstances under which the doctrine can be invoked,

noting: "federal courts ordinarily should entertain and resolve on the merits an action within the

scope of a jurisdictional grant," and that "the pendency of an action in a state court is no bar to

proceedings concerning the same matter in the Federal court having jurisdiction." <u>Sprint</u>, 134 S.Ct. at 588 (internal citations omitted). The Supreme Court further noted that federal courts have erroneously and increasingly analyzed abstention applying only the "<u>Middlesex</u> factors," just as Defendants would have the Court do here.[1] <u>Id.</u> at 593. The Supreme Court held that although the <u>Middlesex</u> factors remain useful considerations when evaluating a request for <u>Younger</u> abstention, they are by no means dispositive. <u>Id.</u> at 588. Instead, <u>Younger</u> abstention is warranted in only three "exceptional circumstances": (1) pending state law criminal charges; (2) civil enforcement proceedings (<u>i.e.</u>, "quasi-criminal proceedings"); and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." <u>Id.</u> (quoting <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans</u>, 491 U.S. 350, 373 (1989) ("<u>NOPSI</u>")).

      Plaintiff argues that because Defendants' claim for <u>Younger</u> abstention relies on the <u>Middlesex</u> argument that the Endowment Act "implicates important state interests," it must fail because <u>Sprint</u> clarified that the <u>Middlesex</u> factors are not dispositive. (Doc. No. 40 at 1.) Defendant Treasurer McCord responds that <u>Younger</u> remains applicable because the second "exceptional circumstance" described in <u>Sprint</u> – the existence of an underlying state civil enforcement action – warrants <u>Younger</u> abstention in this case. <u>Sprint</u>, 134 S.Ct at 588; (<u>see</u> Doc. No. 43 at 1-2.) Because it is clear that the underlying Commonwealth proceeding referenced in this case does not constitute a pending state law criminal matter, or a "civil proceeding[] involving certain orders that are uniquely in furtherance of the state courts' ability

---

[1] The <u>Middlesex</u> factors are: "(1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate important state interests; and (3) the state proceedings afford an adequate opportunity to raise the federal claims." <u>See</u> <u>Middlesex</u>, 457 U.S. at 432.

to perform their judicial functions," the Court will focus its inquiry on whether the Commonwealth proceeding constitutes a "civil enforcement action."  See Sprint, 134 S.Ct. at 592.

### 1.    Overview of civil enforcement proceedings

The threshold question in determining whether an action qualifies as a "civil enforcement proceeding" for Younger purposes is "that the state civil enforcement proceeding must be 'quasi-criminal' in nature."  ACRA Turf Club, LLC v. Zanzuccki, 748 F.3d. 127, 138 (3d Cir. 2014) (quoting Sprint, 134 S.Ct. at 593).  To determine whether a proceeding is "quasi-criminal" the Court must examine whether:  "(1) the action was commenced by the State in its sovereign capacity, (2) the proceeding was initiated to sanction the federal plaintiff for some wrongful act, and (3) there are other similarities to criminal actions, such as a preliminary investigation that culminated with the filing of formal charges."  Sprint, 134 S.Ct. at 592; see also ACRA Turf Club, 748 F.3d. at 138.  Additionally, the fact that "the State could have alternatively sought to enforce a parallel criminal statute" rather than use a civil enforcement proceeding weighs in favor of finding the civil proceeding quasi-criminal in nature.  Id.  In assessing whether the pending Commonwealth proceeding is quasi-criminal in nature, this Court will rely on prior Supreme Court decisions regarding "quasi-criminal" civil proceedings.

In Huffman v. Pursue, Limited, the Supreme Court first recognized that Younger abstention could be applied to civil proceedings.  420 U.S. 592 (1975).  The Huffman Court found Younger abstention warranted when state officials instituted a civil nuisance proceeding against an adult movie theater for violating a state obscenity statute.  Id. at 607.  The Supreme Court noted that the nuisance proceeding was "more akin to a criminal prosecution than are most

civil cases," because it was "both in aid of and closely related to criminal statutes which prohibit the dissemination of obscene materials." Id. at 604.  It emphasized that federal jurisdiction "disrupted [the] State's efforts to protect the very interests which underlie its criminal laws and to obtain compliance with precisely the standards which are embodied in its criminal laws." Id. at 604-05.  In finding Younger abstention warranted, the Supreme Court relied heavily on the overlap between the state's criminal laws and the civil nuisance proceeding.  Id.

In Trainor v. Hernandez, the Supreme Court held that Younger abstention was proper when the Illinois Department of Public Aid brought a state proceeding to recover fraudulently obtained welfare benefits against the federal plaintiffs.  431 U.S. 434 (1977).  Although the state proceeding was technically civil, the Supreme Court found that the state was "vindicat[ing] important state policies such as safeguarding the fiscal integrity of [state-run public-assistance programs]." Id. at 444.  The Supreme Court noted that just as in Huffman, the state could have "vindicated the same interests by initiating a criminal enforcement action." Trainor, 431 U.S. at 444).

In Moore v. Sims, the Supreme Court found Younger abstention warranted when the Texas Department of Human Resources temporarily removed children from parental custody due to suspected child abuse.  442 U.S. 415, 423 (1979).  The children's parents challenged the constitutionality of a state law allowing the Department of Human Resources to remove the children from parental custody pursuant to an emergency ex parte order in federal court.  Id.  In concluding Younger abstention was warranted, the Supreme Court again held that the underlying state proceeding was "in aid of and closely related to criminal statutes." Id.

Finally, in NOPSI, the most recent Supreme Court "civil enforcement proceeding" case

preceding Sprint, the Court found Younger abstention was not warranted when a utility company

filed a federal complaint to challenge a rate-making decision by the New Orleans City Council.

491 U.S. 350 (1989).  Importantly, in determining that the underlying proceeding was not quasi-

criminal, or even judicial in nature, the Supreme Court clarified that, "it has never been

suggested that Younger requires abstention in deference to a state judicial proceeding reviewing

legislative or executive action." Id. at 367-68 (emphasis added).  The Supreme Court held that in

setting utility rates, the Council performed a legislative function, and thus the federal court need

not abstain under Younger.  Id. at 373.

> **2.**    **Whether Defendants' Younger abstention claims meet the "civil enforcement proceeding" standard**

Upon consideration of Sprint, and surveying the Supreme Court's prior decisions

involving Younger abstention and quasi-criminal proceedings, the Court finds no basis for

Younger abstention.  Although the Commonwealth Court proceeding was brought by state actors

in their official capacities, thus satisfying the first prong of the "quasi-criminal proceeding" test,

the state court action does not meet the second and third prongs of the test, and does not qualify

for Younger abstention as a "civil enforcement proceeding."

First, Senator Corman's action in the Commonwealth Court does not bear the factual

hallmarks of the Supreme Court's previous "civil enforcement proceedings" cases.   The record

does not show that the Commonwealth proceeding was initiated to "sanction the federal plaintiff

for some wrongful act," or that it bears "other similarities to criminal actions, such as a

preliminary investigation that culminated with the filing of formal charges."  See Sprint, 134

S.Ct. at 592.  Although state officials filed the complaint pending in Commonwealth Court, no

state actor conducted an investigation into Plaintiff's conduct or involved law enforcement, as was done in <u>Huffman</u> and <u>Trainor</u>.  <u>See Huffman</u>, 420 U.S. at 594-95 (describing the nuisance proceeding as pursued by "the sheriff and prosecuting attorney" of the County); <u>Trainor</u>, 431 U.S. at 438 (stating that the Illinois Department of Public Aid had a sheriff execute a freeze on plaintiffs' funds).  Additionally, there is no indication that state officials could have penalized Plaintiff through state criminal law.  <u>See id.</u>; <u>see also</u> <u>Moore</u>, 442 U.S. at 423 (indicating the importance of the "close relation" between the underlying state proceeding and state criminal law when finding <u>Younger</u> abstention warranted).  Rather, the state complaint centers on Plaintiff's alleged violation of the Endowment Act, which purports to control the monetary penalties Penn State must pay per the consent decree.  (<u>See</u> Doc. No. 1 at ¶¶ 53-61.)  The record therefore does not support a finding that "the proceeding was initiated to sanction the federal plaintiff for some wrongful act."  <u>ACRA Turf Club</u>, 748 F.3d at 138.

Further, rather than implicating a closely-associated state criminal statute, the Endowment Act relates to economic control over the funds Penn State agreed to pay pursuant to the consent decree, and the underlying Commonwealth action merely seeks economic compliance with the Act.  <u>See</u> 24 P.S. §§ 7501-05.  Neither the Act nor the underlying state action appear "retributive in nature," or meant "to punish the sanctioned party for some wrongful act," as is the case in a true civil enforcement proceeding.  <u>ACRA Turf Club</u>, 748 F.3d at 140 (internal citations omitted).  Seeking compliance with a state statute directed at commercial activity is not akin to "quasi-criminal" proceedings, which frequently involve law enforcement

and formal investigations, or overlap substantially with state criminal laws.[2]  See Moore, 442

U.S. at 423; Trainor, 431 U.S. at 444; Huffman, 420 U.S. at 604.  Although the economic

implications of the Act may undermine Plaintiff's ability to fully effect the consent decree by

controlling the disbursement of the monetary sanctions, on the facts alleged here, the Court

cannot find that the adverse impact of the Act is "the equivalent of sanctions found in criminal or

quasi-criminal proceedings."  ACRA Turf Club,748 F.3d at 141.  Moreover, there is no

indication that the Act bears any similarity to a Commonwealth criminal law, or that the state

actors who initiated the state civil action could have initiated a criminal action against Plaintiff.

Thus, the Court finds that the threshold requirement that the underlying state proceeding be

"quasi-criminal" in nature is not met here, and therefore Younger abstention is not warranted.

Accordingly, the Court will deny Defendants' motions to dismiss (Doc. Nos. 17, 18, 19) on the

basis of Younger abstention.

### B.    Pullman abstention

Defendants Governor Corbett and Chairman Zimmer also urge the Court to abstain from

---

[2]  The Commonwealth Court appears to agree, albeit in a different context.  In its recent opinion addressing the NCAA's constitutional challenge to the Endowment Act, the Commonwealth Court repeatedly emphasized that the Act is a "commercial" or "business" regulation, and used that characterization as the basis for its application of the rational basis test. (See Doc. No. 44-3 at 10-11, 16-19.)  It likened the types of debt the Act is intended to regulate to, "large debts, such as commercial mortgages, residential mortgages, car loans, and even college loans . . . ." (Id. at 17.)  It also suggested that one of the Act's primary purposes is to manage the budgets of institutes of higher education engaged in qualifying agreements with "governing bodies," not to regulate the governing body itself.  (See id. at 18-19) ("[The Act's requirements] permit[] the General Assembly to assess the fiscal impact of the monetary penalty at the same time it prepares the budget and determines its annual appropriation to institutions of higher education." (Id. at 18.)  In short, the Commonwealth Court characterizes the Act as a commercial or business regulation aimed at regulating the Commonwealth's appropriations to institutions of higher education, rather than quasi-criminal legislation intended to control "governing bodies" such as the NCAA.

exercising subject matter jurisdiction pursuant to <u>Railroad Commission of Texas v. Pullman</u> <u>Company</u>, 312 U.S. 496 (1941).  (Doc. No. 20 at 21.)  <u>Pullman</u> abstention is warranted "when difficult and unsettled questions of law must be resolved before a substantial federal constitutional question can be decided." <u>Haw. House Auth. v. Midkiff</u>, 467 U.S. 229, 236 (1984).  To abstain under <u>Pullman</u>, the Court must find the following three "special circumstances" exist in the case: "(1) [u]ncertain issues of state law underlying the federal constitutional claims brought in federal court; (2) [s]tate law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims; (3) [a] federal court's erroneous construction of state law would be disruptive of important state policies." <u>Chez Sez III Corp. v. Twp. of Union</u>, 945 F.2d 628, 631 (3d Cir. 1991) (internal citations omitted).  All three special circumstances must exist to warrant <u>Pullman</u> abstention. <u>Id.</u>  If so, the Court "must then make a discretionary determination as to whether abstention is in fact appropriate under the circumstances of the particular case, based on the weight of these criteria and other relevant factors." <u>Id.</u>

### 1.    Uncertain issues of state law

In determining whether a state law underlying a federal constitutional issue is uncertain for <u>Pullman</u> purposes, the Court must first determine whether the language of the statute is "clear and unmistakable." <u>Id.</u> at 632 (citations omitted).  Abstention is not warranted when "an otherwise ambiguous statute has been authoritatively construed by the state courts." <u>Id.</u> (internal citations omitted).  The Court turns to the language of the Act itself.[3]

--------

[3] The Act reads:

(a) If an institution of higher education pays a monetary penalty pursuant to an agreement

Defendants and Plaintiff agree that Penn State is an "institution of higher education," and the NCAA is a "governing body" for purposes of the Act.[4]  (Doc. No. 1 ¶ 52; Doc No. 20 at 11; Doc No. 21 at 11.)  The parties also agree that the Act applies to the consent decree between Penn State and Plaintiff.  (Id.)  No party asserts a reading of the statutory text outside its plain

---

entered into with a governing body and: (1) the monetary penalty is at least $10,000,000 in installments over a time period in excess of one year; and (2) the agreement provides that the monetary penalty will be used for a specific purpose, then the monetary penalty shall be deposited into an endowment that complies with the provisions of subsection (b).

(b) An endowment under subsection (a) shall satisfy the following requirements: (1) The endowment shall be established as a separate trust fund in the State Treasury and the State Treasurer shall be custodian thereof. The State Treasurer shall invest the money in the endowment subject to the prudent investor provisions of 20 Pa. C.S. § 7203 (relating to prudent investor rule).  The moneys of the separate trust fund are appropriated to the commission on a continuing basis to carry out the provisions of this act.  (2) In addition to the monetary penalty deposited into the endowment, the endowment shall be authorized to accept donations from any source. (3) The commission shall expend the money of the endowment in accordance with the purposes enumerated in the agreement between the institution of higher education and the governing body and subject to the provisions of paragraph (4).  (4) Unless otherwise expressly stated in the agreement, the funds may only be used within this Commonwealth for the benefit of the residents of this Commonwealth and on any of the following: (i) Programs or projects preventing child sexual abuse and/or assisting the victims of child sexual abuse.  (ii) Multidisciplinary investigative teams established under 23 Pa. C.S. (Relating to domestic relations).  (iii) Child advocacy centers.  (iv) Victim service organizations that provide services to children subjected to sexual abuse.  (v) Training of persons who are mandated by law to report child sexual abuse or to treat victims of child sexual abuse.  (5) If the endowment is established to exist for at least five years: (i) During the first five years, not more than 50% of the monetary penalties paid into the endowment shall be expended annually as provided in paragraphs (3) and (4).  (ii) Each year thereafter, all interest and earnings of the endowment shall be expended as provided in paragraphs (3) and (4).

24 Pa. Stat. Ann. § 7503 (2013).

[4] The Act defines the key phrase "governing body" as "[a]n organization or legal entity with which an institution of higher education is associated and which body may impose a monetary penalty against the institution of higher education," and defines "institution of higher education," as "[a] postsecondary educational institution in this Commonwealth that receives an annual appropriation from an act of the General Assembly."  24 Pa. Stat. Ann. § 7502 (2013).

meaning.  In contending that <u>Pullman</u> abstention is warranted, Defendants Governor Corbett and Chairman Zimmer do not assert that the Endowment Act is unclear or ambiguous.  Rather, the plain language of the statute, coupled with its statutory definitions, led both Plaintiff and Defendants to the same conclusion – that the Act unequivocally applies to the consent decree. (Doc. No. 1 ¶ 52; Doc No. 20 at 11; Doc No. 21 at 11.)

Accordingly, the Court finds that the language of the Endowment Act is "clear and unmistakable," and Defendants therefore have not established the first "special circumstance" warranting <u>Pullman</u> abstention.  <u>Chez Sez III</u>, 945 F.2d at 632.  Although the Court could conclude its <u>Pullman</u> inquiry here, because <u>Pullman</u> abstention requires the existence of all three "special circumstances," the Court will nonetheless analyze the second and third "special circumstances" in order to fully address Defendants' arguments on this matter.

### 2.      Potential narrowing construction

The second "special circumstance" for <u>Pullman</u> abstention is whether "state law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of the constitutional issues" exist.  <u>Chez Sez III</u>, 945 F.2d at 631.  In making this determination, "[t]he relevant inquiry is not whether there is a bare, though unlikely, possibility that state courts might render adjudication of the federal question unnecessary."  <u>Haw. Housing Auth.</u>, 467 U.S. at 237.  Defendants Governor Corbett and Chairman Zimmer do not identify any narrowing constructions that would avoid Plaintiff's constitutional challenges.  Instead, they claim <u>Pullman</u> abstention is warranted because were the Commonwealth Court to find that Senator Corman lacked standing, it would not reach Plaintiff's "complicated legal issues associated with the federal Commerce, Contracts, and Takings clauses."  (Doc. No. 20 at 16.)

18

The Court finds that this argument does not establish the existence of the second "special circumstance," i.e., that the Endowment Act is open to a state court interpretation that would avoid Plaintiff's constitutional challenges.  See id.  First, the Commonwealth Court overruled the NCAA's preliminary objection to Senator Corman's standing, allowing him to proceed to the merits of his Commonwealth Court case.  See Corman, 74 A.3d at 1161-62.  The Commonwealth Court's decision on that matter therefore moots Defendants' argument that the Commonwealth Court could possibly avoid Plaintiff's constitutional challenges by denying Senator Corman standing.  See id.  Based on the record and the language of the Endowment Act itself, the Court finds that the Act is not "obviously susceptible of a limiting construction," see Haw. Housing Auth., 467 U.S. at 237, and the second "special circumstance" allowing Pullman abstention is not present.  The Court proceeds to analyze the third "special circumstance."

###   3.   Possibility that the Court's interpretation could interfere with important state policies

To assess whether the third "special circumstance" exists, the Court must determine whether a federal court's erroneous interpretation of the statute could interfere with important state policies.  Chez Sez III, 945 F.2d at 633.  Defendants Governor Corbett and Chairman Zimmer argue that because the Endowment Act is a new law which has yet to be evaluated by Pennsylvania courts, "conflicts in the interpretation of state law may result, which would be detrimental to the success of Pennsylvania's policies in regulating the conduct of its higher educational institutions."  (Doc. No. 20 at 22-23.)  Defendants Governor Corbett and Chairman Zimmer also argue that because Plaintiff challenges the Act on both state and federal constitutional grounds, "the Commonwealth Court should be given an opportunity to resolve the

state law questions in the context of that proceeding . . . ."  (Doc. No. 20 at 23.)  Although

Defendants Governor Corbett and Chairman Zimmer do not use the precise language of the

Pullman "special circumstances" test, the Court construes their arguments as supporting the

conclusion that the Court's interpretation could interfere with important state policies.

 The Court rejects Defendants' argument that the relative youth of the Endowment Act

might create a conflict between state and federal courts, and that "it is entirely possible" the

Commonwealth Court might rule in a way to avoid the Plaintiff's federal constitutional

challenges.  This argument is no more than a "bare, though unlikely" assertion that the Court's

interpretation could interfere with important state policies.  See Haw. Housing Auth., 467 U.S. at

237; (Doc. No. 20 at 23).  Accordingly, the Court finds Defendants' argument that the Court's

exercise of jurisdiction "may result" in conflicting state and federal interpretations of the law

does not establish the third "special circumstance" allowing Pullman abstention.

 The Court also rejects Defendants' argument that this Court should abstain because the

Commonwealth Court should first resolve any state law questions.  Plaintiff has not advanced

any state constitutional arguments in its federal case.  (Doc. No. 27 at 8) ("The NCAA has filed

"a federal complaint–based entirely on federal law. . . ." Id. at 8 n.6.)  Further, even were

Plaintiff to rely on the Pennsylvania rather than the federal constitution for its claims under the

Takings and Contracts clauses, the Court's interpretation would not interfere with important state

policies, because Pennsylvania courts have interpreted the Pennsylvania Constitution's Takings

and Contracts clauses consistently with those of the federal constitution.  See, e.g.,

Redevelopment Auth. of Phila. v. Lieberman, 336 A.2d 249, 251 (Pa. 1975) ("The Pennsylvania

Constitution requires the same standard" for Takings claims as the federal constitution).  See also

Transp. Workers Union of Am., Local 290 by & through Fabio v. SEPTA, 145 F.3d 619, 625 (3d Cir. 1988) ("The Contract Clause of the Pennsylvania Constitution . . . is generally to be applied in the same manner as its federal counterpart.") Id.  Thus, even were the Court called upon to address claims under the Pennsylvania Constitution, it would rely on federal constitutional law, not unsettled questions of Pennsylvania state law, to resolve the claims.  The Pullman doctrine does not require abstention when there are no unsettled questions of state law.  See Haw. Housing Auth., 467 U.S. at 236.  Therefore, the Court finds that Defendants Governor Corbett and Chairman Zimmer have not established that Pullman abstention is warranted, and accordingly, the Court will deny the motion to abstain on the basis of Pullman.  (Doc. No. 17.)

## C.     Colorado River **abstention**

Defendants Treasurer McCord and Auditor General DePasquale seek abstention under the Colorado River doctrine.  (See Doc. No. 21 at 21; Doc. No. 22 at 8.)  Colorado River allows for federal abstention "when there is a parallel ongoing state court proceeding."  Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc., 571 F.3d 299, 307 (3d Cir. 2009) (citing Colo. River Water Conservation Dist. v. United States, 424 U.S. 800 (1976)).  Abstention under Colorado River is "considerably more limited than the circumstances appropriate for abstention" under other doctrines.  Colo. River, 424 U.S. at 818.  Indeed, Colorado River abstention "is appropriate only when there is a 'strong federal policy against [such] litigation" in federal court.  Spring City Corp. v. Am. Bldgs. Co., 193 F.3d 165, 172 (3d Cir. 1999) (quoting Univ. of Md. v. Peat Marwick Main & Co., 932 F.2d 265, 276-76 (3d Cir. 1991)).

To determine whether Colorado River abstention is warranted, the Court first makes a threshold inquiry as to "whether there is a parallel state proceeding that raises substantially

identical claims [and] nearly identical allegations and issues." Nationwide, 571 F.3d at 307.

Generally, when cases "involve the same parties and claims," they are considered parallel

proceedings for Colorado River abstention purposes. Trent v. Dial Med. of Fla., Inc., 33 F.3d

217, 223 (3d Cir. 1994), superseded by statute on other grounds as stated in Nat'l City Mortg.

Co. v. Stephen, 647 F.3d 78, 83 (3d Cir. 2011). If the initial inquiry is met, the Court then uses

"a multi-factor test to determine whether 'extraordinary circumstances' meriting abstention are

present." Nationwide, 571 F.3d at 308. To determine whether such "extraordinary

circumstances" exist, the Court applies the following six factors:

> (1) [in an in rem case,] which court first assumed jurisdiction over [the] property;
> (2) the inconvenience of the federal forum;
> (3) the desirability of avoiding piecemeal litigation;
> (4) the order in which jurisdiction was obtained;
> (5) whether federal or state law controls; and
> (6) whether the state court will adequately protect the interests of the parties.

Nationwide, 571 F.3d at 309.

### 1.    Parallel state proceeding

First, the Court must determine whether the suit pending in the Commonwealth Court is

parallel to the above-captioned action under the Colorado River doctrine. "Generally, cases

parallel when they involve the same parties and claims." Ryan v. Johnson, 115 F.3d 193, 196

(3d Cir. 1997). The cases do not need to be precisely identical, but "there must be a likelihood

that the state litigation will dispose of all the claims presented in the federal case." Flint v. A.P.

Dessano & Sons, 234 F. Supp. 2d 506, 510-11 (E.D. Pa. 2002). However, "[w]hen the claims,

parties, or requested relief differ, deference may not be appropriate." Bankers Trust Co. v.

Chatterjee, 636 F.2d 37, 40 (3d Cir. 1980). For instance, when the federal lawsuit plaintiff is a

defendant in the state court proceeding, and the federal proceeding includes several defendants

who are not party to the state court proceeding, "the lawsuits are not parallel." Bill Goodwin

Const., LLC v. Wondra Const., Inc., No. 13-157, 2013 WL 4005307, at *8 (M.D. Pa., Aug. 5,

2013).

Here, the NCAA is a plaintiff in the federal case but a defendant in the state court

proceeding. Further, this action includes defendants who are not parties to the state court

proceeding (namely, Governor Corbett, Chairman Zimmer, and Auditor General DePasquale).

(See Doc. No. 1 at 1; Doc. No. 33-1 at 2) (listing the parties to the federal and state proceedings,

respectively.) Additionally, Senator Corman, the initiating plaintiff in the Commonwealth Court

case, is not party to the federal action (see Doc. No. 39) (denying Senator Corman's motion to

intervene in the above-captioned action), and Penn State, who is not a party to this action, was

recently added to the Commonwealth proceeding as an indispensable party. (See Doc. No. 44-3

at 32.) Because the state and federal lawsuits include different parties, as well as identical parties

in different procedural postures, the Court finds that the cases are not parallel. The threshold

requirement for Colorado River abstention is not met. The Court will briefly address

Defendants' remaining arguments.

### 2.    "Extraordinary circumstances"

If a party meets the threshold inquiry under Colorado River, the Court then applies a

multi-factor test to determine whether "extraordinary circumstances" warranting abstention exist.

Nationwide, 571 F.3d at 309. No one factor is dispositive, and "the balancing of factors is

heavily weighted in favor of the exercise of jurisdiction." Id. at 308 (internal citations omitted).

Defendant Auditor General DePasquale's argument that Colorado River abstention is

warranted is limited to the following: "[i]n the present matter, there are clearly parallel ongoing cases pending.  Furthermore, both of the parallel actions were filed prior to the present action, and decisions in one or both of the other actions would render this case moot and resolve the claims between the NCAA and the Commonwealth parties.  Under considerations of 'wise judicial administration' and judicial resources, this Court should dismiss this case . . . ." (Doc. No. 22 at 8.)  The Court construes Defendant Auditor General DePasquale as arguing that an extraordinary circumstance exists based on "the order in which jurisdiction was obtained."  See Nationwide, 541 F.3d at 309.

The Court finds that Colorado River abstention is not warranted.  Although Senator Corman's original Commonwealth Court action was filed before this action, its filing also predated enactment of the Endowment Act.  See 24 P.S. §§ 7501-05 (enacted February 20, 2013); Corman v. Nat'l Collegiate Ass'n of Athletics, 74 A.3d 1149 (Pa. Cmwlth Ct. 2013).  Plaintiff filed the above-captioned action on February 20, 2013, the same day the Endowment Act was enacted into law.  (See Doc. No. 1.)  Thus, the Court finds Defendant Auditor General DePasquale's argument that the Commonwealth proceeding was filed before this case does not support abstention under Colorado River.  The Court further finds that Defendant Auditor General DePasquale fails to establish the existence of "extraordinary circumstances" warranting Colorado River abstention.  The Court will next examine Defendant Treasurer McCord's arguments for Colorado River abstention.

Defendant Treasurer McCord identifies "the desirability of avoiding piecemeal litigation"

as a factor weighing heavily in favor of <u>Colorado River</u> abstention.[5]  He further argues that "[n]othing in the scheme [that Pennsylvania created with the Endowment Act] calls for, requires, or compels piecemeal litigation."  (Doc. No. 21 at 24.)  However, successful invocation of <u>Colorado River</u> abstention on the grounds of avoiding piecemeal litigation occurs "only when there is evidence of a strong federal policy that all claims should be tried in the state courts." <u>Ryan v. Johnson</u>, 115 F.3d 193, 198 (3d Cir. 1997).  Here, Defendant Treasurer McCord does not rely on any federal policy in his argument for <u>Colorado River</u> abstention, let alone a federal policy mandating that Plaintiff's claims should proceed in state, rather than federal court.  Rather, Defendant Treasurer McCord relies on the Endowment Act, a Pennsylvania state law, for his position that the "piecemeal" factor in <u>Colorado River</u> analysis is met.  (Doc. No. 24 at 19.)  The Court finds that this is not enough to establish "extraordinary circumstances" as required by <u>Colorado River</u>, because the "avoidance of piecemeal litigation" factor requires a showing of "a strongly articulated <u>congressional policy</u> against piecemeal litigation in the specific context of the case under review."  <u>Ryan</u>, 115 F.3d at 198.  The Court finds that Defendant Treasurer McCord has failed to establish the existence of such a policy here.  Accordingly, the Court finds that <u>Colorado River</u> abstention is not warranted, and the Court will deny Defendants' motions to dismiss on the basis of <u>Colorado River</u> abstention.  (Doc. Nos. 18, 19.)

---

[5] Treasurer McCord also argues that the circumstances surrounding Penn State's consent decree with the NCAA amount to "extraordinary circumstances."  (Doc. No. 21 at 24.)  However, he concedes that while the context surrounding the consent decree may be "extraordinary" in the sense that the penalties the NCAA imposed on Penn State were unprecedented, such contextual information does not establish any of the "exceptional circumstances" factors as required by <u>Colorado River</u>.  (<u>See id.</u> at 23-24) ("<u>Before</u> turning to the six factors relevant to the 'exceptional circumstances' analysis, it is useful to first revisit the context in which this litigation arises.") (<u>Id.</u>)  (emphasis added).

**D.      Defendants' motion to stay the matter**

In the alternative, Defendants argue that this matter should be stayed pending resolution of Governor Corbett's federal antitrust suit.  (See Doc. No. 20 at 24; Doc. No. 21 at 25; Doc. No. 22 at 9.)  However, because the Court dismissed Governor Corbett's antitrust claims, the Court finds Defendants' motions for a stay moot.  See Pennsylvania v. Nat'l Collegiate Athletic Ass'n, 948 F. Supp. 2d 416 (M.D. Pa. 2013).  Accordingly, the Court will decline to stay this matter.

**IV.    CONCLUSION**

The Court will deny Defendants' motions to dismiss on the basis of abstention, and will decline to stay the matter.  (Doc. Nos. 17, 18, 19.)  An order consistent with this memorandum follows.