IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, Plaintiff | : : : : |
| v. | : No. 1:13-cv-00457 : : (Judge Kane) |
| THOMAS W. CORBETT, JR., in his capacity as Governor of the Commonwealth of Pennsylvania, et al., Defendants | : : : : : |

## MEMORANDUM

Before the Court is Plaintiff National Collegiate Athletic Association's ("NCAA") motion for judgment on the pleadings (Doc. No. 58), and Defendant McCord's cross-motion for judgment on the pleadings (Doc. No. 74), joined by Defendant Zimmer. The motions have been fully briefed and are ripe for disposition. For the reasons that follow, the Court will grant Defendants' cross-motion for judgment on the pleadings and deny Plaintiff's motion for judgment on the pleadings as moot.

I.  BACKGROUND

In this action, the NCAA challenges on constitutional grounds an enactment of the Pennsylvania legislature entitled the Pennsylvania Institution of Higher Education Monetary Penalty Endowment Act ("the Endowment Act," or "the Act") and seeks an order of this Court enjoining the law's enforcement. (Doc. No. 1.) Defendants State Treasurer Rob McCord and Commission on Crime and Delinquency Chairman Mark Zimmer, each in his official capacity,

have defended the law's constitutionality.[1] (Doc. Nos. 48, 49.) In their cross-motion for judgment on the pleadings, Defendants urge the Court to decline Plaintiff's constitutional challenge based on the doctrines of issue and claim preclusion. (Doc. No. 74.) The factual predicate for this lawsuit is by now familiar, so the Court will recount only those facts with particular relevance to the present motions.

### A.     The Contract

The NCAA is a membership-based private organization that sets standards for intercollegiate athletics, including college football. (Doc. No. 48 ¶ 10.) In addition to setting rules for student athletes, the NCAA's bylaws place within its purview "the broad spectrum of activities affecting [an] athletics program." (Doc. No. 1 ¶¶ 25-28.) With its broad authority, the NCAA asserts the power to regulate the behavior of administrators and coaches, and non-compliance may result in heavy penalties. (Id.) As an NCAA member, the Pennsylvania State University ("Penn State") is subject to enforcement actions for violations of NCAA rules. (Id. ¶¶ 21, 23, 28.) On November 4, 2011, the Attorney General of the Commonwealth filed criminal charges against Gerald A. Sandusky for sexual crimes against children, and against Penn State's Athletic Director and senior Vice President for failing to report allegations of child abuse and perjury. (Doc. No. 1 ¶¶ 29, 32.) Penn State commissioned an investigation into the abuse and the response of its athletics department and administration to it. (Id. ¶¶ 32-34; Doc. Nos. 48 ¶¶ 32-34; 49 ¶¶ 32-34.) The resulting report, widely known as the Freeh Report, identified key failures on the part of university officials. (Doc. Nos. 1 ¶ 35; 48 ¶ 50; 49 ¶ 50.) To settle the

---

[1] The parties stipulated to the dismissal of previous defendants Governor Thomas Corbett and Auditor General Eugene DePasquale. (Doc. No. 67.)

question of sanctions, the NCAA and Penn State entered into a contract on July 23, 2012, wherein the university agreed to certain punitive actions. (<u>See</u> Doc. No. 1-4.) The contract is styled as a "Binding Consent Decree Imposed by the [NCAA] and Accepted by [Penn State]," but the document memorializes a private contract between a private association and a state-related university.[2] (<u>See</u> <u>id.</u>) The contract includes findings and conclusions drawn principally from the Freeh Report, including an enumeration of various NCAA rules that Penn State administrators violated. (Doc. No. 1-4 at 2-4.) The consent decree itemizes punitive sanctions imposed upon the university: (1) a $60 million fine; (2) a four-year ban on post-season football competition; (3) a four-year reduction in athletic scholarships; (4) a five-year "probation;" (5) the vacation of all Penn State football victories from 1998 to 2011; (6) the forfeiture of measures designed to retain student-athletes; and (7) the continued possibility of NCAA sanctions against individuals. (<u>Id.</u> at 5-6.)

The present litigation concerns disposition of the monetary penalty. The consent decree provides for payment of the fine "into an endowment for programs preventing child sexual abuse and/or assisting the victims of child sexual abuse" in annual installments of twelve million dollars for five years. (<u>Id.</u>) By the terms of the contract, no endowment funds may be used "to fund programs at the University," and no "sponsored athletic team" can be "reduced or eliminated" as part of Penn State's payments. (<u>Id.</u>) The consent decree itself is not explicit as to the logistics of the endowment's formation or governance. (<u>See</u> <u>id.</u>) The terms of the contract

---

[2] While the term, consent decree, typically denotes the formal endorsement of a court, the present agreement is between the university and the NCAA only. <u>See</u> <u>Decree</u>, Black's Law Dictionary (9th ed. 2009.) The Court refers to the parties' agreement as the "contract," or the "consent decree."

are also silent as to the geographic scope of the resulting endowment, except insofar as no Penn State program can directly benefit from it.  (Id.)  Then-Penn State President Rodney Erickson released a statement on the day he signed the consent decree, indicating that through the NCAA-imposed fine, Penn State would "become a national leader to help victims of child sexual assault and to promote awareness across our nation."  (Doc. No. 59-4.)  The NCAA alleges that on September 18, 2012, the NCAA convened the Child Sexual Abuse Endowment Task Force, whose membership includes at least two Penn State officials, to create and manage the resulting endowment.  (Doc. No. 1 ¶¶ 45, 47.)  According to the NCAA, the task force also includes members from national non-profit organizations, other NCAA members, and the federal government.  (Id. ¶¶ 45-46)  The NCAA also quotes another Penn State press release: "'[all endowment funds will] flow to programs designed to prevent child sexual abuse or assist the victims of child sexual abuse nationwide.'"  (Id. ¶ 47.)  Defendants deny that the consent decree requires the formation of an endowment task force, and they maintain that the consent decree "is silent as to the structure of the endowment, its control, or any other features."  (Doc. Nos. 48 ¶¶ 45-48; 49 ¶¶ 46-48.)  To date, Penn State has paid $12 million into an account scheduled to be transferred into the endowment.  (Id. ¶ 48; Doc. No. 49 ¶ 48.)  In the consent decree, the presidents of the NCAA and Penn State agreed that the contract could be modified or clarified in the future through their mutual written assent.  (Doc. No. 1-4 at 8-9.)

    **B.**    **The Endowment Act**

On December 28, 2012, state Senator Jake Corman published his intent to introduce a state senate bill requiring all endowment funds to "be distributed for the benefit of the state and its residents."  (Doc. No. 1-3.)  The bill's purpose was "to impact the $60 million financial

penalties placed upon the Penn State University." (Id.) Senator Corman voiced his intent to keep endowment funds in Pennsylvania through a memorandum to other state senators. (Id.) To that end, Senator Corman introduced the senate bill later enacted as the Institution of Higher Education Monetary Penalty Endowment Act of 2013, 24 P.S. §§ 7501-05, commonly known as the Endowment Act. (See id.) Governor Corbett signed the measure into law on February 20, 2013 to take immediate effect. See 24 P.S. § 7503.

The Endowment Act applies to public colleges and universities that enter into punitive agreements with "governing bodies" to pay large monetary penalties in installments. Id. §§ 7502-03. When the school agrees to a fine of more than $10 million to be paid "over a time period in excess of one year," and when the language of the agreement identifies "specific purposes" for which the fine money will be used, the law requires that the fine be deposited into a state-administered endowment, notwithstanding the language of the agreement or any intent of the signatories. See id. § 7503(a). A governing body is defined as an entity with which a public college or university is associated and that has the authority to impose monetary penalties on the school. Id. § 7502. The resulting state-administered endowments are to be separate funds within the state treasury disbursed by the Pennsylvania Commission on Crime and Delinquency (the "Commission"). Id. §§ 7502-03. The state treasurer is directed to act in a fiduciary capacity as custodian of the fund and to invest the money in accordance with Pennsylvania's prudent investor guidelines. See id. § 7503(b). The Act provides limits on annual expenditures for endowments that will exist for five years or more. Id. § 7503(b)(5). Absent an explicit contrary statement in the punitive agreement, the Commission is directed to expend endowment funds exclusively "within this Commonwealth for the benefit of the residents of this Commonwealth."

Id. § 7503(b)(4). In effect, signatories have no authority to set up, manage, invest, or otherwise control the money from covered monetary fines beyond designating a specific purpose and specifying if they desire the money to leave the state.

### C. Judicial Proceedings

On February 20, 2013, the day that the Endowment Act became law, the NCAA invoked federal jurisdiction by filing a complaint with this Court. (Doc. No. 1.) The NCAA is seeking both a declaration that the Endowment Act violates the United States Constitution and an injunction barring application of the Endowment Act to the consent decree monetary penalty. (Id.) The NCAA argues that the Act is unconstitutional because it violates the United States Constitution's Commerce, Takings, and Contract clauses. (Id.)

On the same day that this action was filed, on February 20, 2013, Senator Corman and Defendant McCord amended their complaint in an existing action in the Commonwealth Court of Pennsylvania to request injunctive relief under the new law, specifically requesting the Commonwealth Court to order Penn State or the NCAA to deposit the fine money into the state treasury.[3] (Doc. No. 45 at 3-6.) The NCAA filed preliminary objections to the amended state court complaint, repeating the constitutional arguments from its federal complaint. (Doc. No. 74-1 at 3-4.) The NCAA's preliminary objections also raised new arguments: the NCAA challenged the constitutionality of an additional Pennsylvania statute, sought to join Penn State as an indispensable party, and raised arguments under the Pennsylvania Constitution. Corman v.

---

[3] Earlier, on January 4, 2013, Senator Corman filed suit against the NCAA in the state court, seeking a declaration or an injunction that endowment funds must remain in Pennsylvania. (Doc. No. 45 at 3-6.) The original complaint raised arguments under general laws regulating the state appropriations process to Penn State. (Doc. No. 27-5 at 10-12.) This Court has declined to allow state Senator Corman to intervene in the federal lawsuit. (Doc. No. 39)

NCAA, 74 A.3d 1149, 1167-73 (Pa. Commw. Ct. 2013). On September 4, 2013, the Commonwealth Court, sitting en banc, overruled the NCAA's Commerce, Contract, and Takings clause-based objections. Id. In its subsequent Commonwealth Court answer, the NCAA raised those constitutional arguments for a third time. (Doc. No. 74-1 at 3.)

In this Court on October 6, 2014, the NCAA filed both a motion for judgment on the pleadings and a motion for expedited consideration. (Doc. Nos. 58, 60). On October 15, 2014, Defendant McCord and Senator Corman filed their own motion for judgment on the pleadings in the parallel state court suit. (Doc. No. 79-2.) On October 31, 2014, the same day that briefing closed on the NCAA's federal motions, the Commonwealth Court entered an order pursuant to Pennsylvania Rule of Civil Procedure 1034 granting Senator Corman and Defendant McCord's motion for partial judgment on the pleadings. (Doc. Nos. 73, 74-1.) The Rule 1034 Order holds that no genuine issue of material fact exists related to the constitutionality of the Act and adopts wholesale the constitutional analysis of the Commonwealth Court in its en banc opinion overruling the NCAA's preliminary objections.[4] (See Doc. No. 74-1 at 6-8.)

Following entry of the Commonwealth Court's Rule 1034 Order, on November 4, 2014, Defendant McCord, later joined by Defendant Zimmer, filed a cross-motion for judgment on the pleadings with this Court, arguing that the Commonwealth Court's Rule 1034 Order has both issue and claim preclusive effect. (Doc. No. 74 at 2.) Both the NCAA's original motion and Defendants' cross motion have been fully briefed and are ripe for disposition.

## II. DISCUSSION

---

[4] The Rule 1034 Order was accompanied by other reasoning unrelated to the Endowment Act's constitutionality, as discussed below. (See Doc. No. 74-1.)

## A. Rule 12(c)

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a motion for judgment on the pleadings may only be granted by a district court when "there is no material issue of fact to resolve, and [the moving party] is entitled to judgment as a matter of law." D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 271 (3d Cir. 2014) (quoting Mele v. Fed. Reserve Bank of N.Y., 359 F.3d 251, 253 (3d Cir. 2004)). The standard governing disposition of a defendant's Rule 12(c) motion for judgment on the pleadings is identical to the standard employed when evaluating a Rule 12(b)(6) motion to dismiss all or part of a complaint. Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991). When a plaintiff seeks judgment on the pleadings pursuant to Rule 12(c), reasonable factual inferences are to be drawn in favor of the defendant(s), whereas on a defendant's Rule 12(c) motion, reasonable factual inferences are to be drawn in favor of the plaintiff(s). See id.

## B. Preclusion

Defendants argue that the Commonwealth Court's Rule 1034 Order is a valid final judgment to which this Court should afford both issue preclusive and claim preclusive effect. (Doc. No. 77 at 9-10.) Plaintiff maintains that the Rule 1034 Order is entitled to no preclusive effect, because it is not a final judgment and because Plaintiff never benefitted from a full and fair opportunity to litigate the constitutionality of the Endowment Act. (Doc. No. 79 at 3, 8-9.)

Federal courts are statutorily obligated to afford state court judgments "full faith and credit," including affording preclusive effect to final and valid state court orders: "Such Acts, records and judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State, Territory, or

Possession from which they are taken." See Full Faith and Credit Act, 28 U.S.C. § 1738. The Full Faith and Credit Act embodies "the important values of federalism and comity." Parsons Steel, Inc. v. First Ala. Bank, 474 U.S. 518, 523 (1986). The statute's mandate applies with no less force when the state court judgment is, for example, (1) entered by consent, see e.g., Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 374 (1996); (2) entered on an claim within the exclusive jurisdiction of the federal courts, Marrese v. Am. Acad. Orthopaedic Surgeons, 470 U.S. 373, 383-384 (1985); or even (3) facially erroneous, see Parsons Steel, 474 U.S. at 772-773. "Federal courts must 'give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.'" Allegheny Intern., Inc. v. Allegheny Ludlum Steel Corp., 40 F.2d 1416, 1429 (3d Cir. 1994) (quoting Kremer v. Chemical Constr. Corp., 456 U.S. 461, 466 (1982)). The Court therefore looks to the preclusion law of Pennsylvania to determine whether the Commonwealth Court's Rule 1034 Order is entitled to either issue or claim preclusive effect.[5] Greenleaf v. Garlock, Inc., 174 F.3d 352, 357 (3d Cir. 1999).

In Pennsylvania, the related but distinct doctrines of issue and claim preclusion affect a party's ability to relitigate claims or arguments adjudicated in other proceedings.[6] Gregory v.

---

[5] Federal law imposes an outer limit on the scope of state law preclusion. Kremer v. Chemical Constr. Corp., 456 U.S. 461, 481-482 (1982). No state could give preclusive effect to judgments that fail to "satisfy the minimum procedural requirements" of due process, so federal courts need not afford preclusive effect to state judgments that are in that way constitutionally defective. Id. However, neither party argues that the Rule 1034 Order and the balance of the Commonwealth Court proceedings violated due process.

[6] For clarity, the Court uses "issue preclusion" and "claim preclusion" from the Restatement (Second) of Judgments, rather than the traditional terms of collateral (or here, perhaps direct) estoppel and res judicata. See Hebden v. W.C.A.B. (Bethenergy Mines, Inc.), 632 A.2d 1302, 1304 (Pa. 1993) ("We acknowledge that the term 'res judicata' is a somewhat

Chehi, 843 F.2d 111, 115 (3d Cir. 1988).  Claim preclusion and issue preclusion in Pennsylvania "shar[e] the common goals of judicial economy, predictability, and freedom from harassment." Id. at 116.  "[I]ssue preclusion forecloses re-litigation in a later action, of an issue of fact or law which was actually litigated and was necessary to the original judgment."  Hebden v. W.C.A.B. (Bethenergy Mines, Inc.), 632 A.2d 1302, 1304 (Pa. 1993) (internal quotations omitted).  While issue preclusion bars only those issues that were actually considered by the other court, claim preclusion may be invoked to bar a party from raising claims or issues that could have been (but were not necessarily) litigated in the other adjudication.  Edmundson v. Borough of Kennett Square, 4 F.3d 186, 189 (3d Cir. 1993).  Issue preclusion may affect only parts of a separate action, or if a previous judgment conclusively decided all of the issues or an essential issue in a new action, issue preclusion may foreclose the new action altogether.  See Thompson v. Karastan Rug Mills, 323 A.2d 341, 343 (Pa. Super. Ct. 1974) ("[W]here the sole issue in the case on which judgment hinges was previously litigated, [issue preclusion] will then bar the second action.").  Defendants argue that both claim and issue preclusion prevent the Court's consideration of Plaintiff's constitutional challenges to the Endowment Act.  (Doc. No. 77.)

Issue preclusion applies when four conditions are met: (1) the issue decided previously and the issue in the new proceeding are identical; (2) there was a final judgment on the merits in the prior action; (3) the party against whom preclusion is asserted was a party or in privity with a party in the prior action; and (4) the party to be precluded had a full and fair opportunity to litigate the issue in the prior action.  Greenleaf v. Garlock, Inc., 174 F.3d 352, 357-358 (3d Cir. 1999) (applying Pennsylvania preclusion law).  Some Pennsylvania courts have imposed a fifth

---

sloppy term . . . ."); see also, Restatement (Second) of Judgments § 27, cmt. b.

condition: (5) that the determination of the issue was essential to the judgment in the prior action. Metro. Edison Co. V. Penn. Pub. Util. Comm'n, 767 F.3d 335, 350-351 (3d Cir. 2014) (citing Office of Disciplinary Counsel v. Kiesewetter, 889 A.2d 47, 50-51 (Pa. 2005)). Plaintiff's arguments address the second (2) and fourth (4) conditions. (Doc. No. 79.)

1. **Finality**

Defendants rely on Pennsylvania Rule of Appellate Procedure 341(b) and on Pennsylvania's Declaratory Judgments Act in support of their contention that the Rule 1034 Order "is a final decision on the merits of the NCAA's constitutional claims." (Doc. No. 77 at 16.) The NCAA counters that because the Rule 1034 Order merely "narrowed the scope" of the pending proceeding in the Commonwealth Court, it is a non-appealable interlocutory order. (Doc. No. 79 at 4-5, 8.)

For the purposes of issue preclusion, however, the availability of an appeal is not determinative. Greenleaf, 174 F.3d at 358-359 (applying Pennsylvania preclusion law). Under Pennsylvania law, a court applying issue preclusion considers several factors to decide whether the prior adjudication "is sufficiently firm to be accorded conclusive effect." Commonwealth v. Holder, 805 A.2d 499, 502-503 (Pa. 2002) (quoting Restatement (Second) of Judgments § 13 cmt. g.). These factors include:

> (a) whether the prior adjudication was "adequately deliberated and firm" and not "avowedly tentative;"
> (b) whether the parties were fully heard;
> (c) whether the court supported its decision with a reasoned opinion;
> (d) whether the court's prior decision was subject to appeal or was in fact appealed.

Greenleaf, 174 F.3d at 358 (quoting Restatement (Second) of Judgments § 13 cmt. g.). The Court turns first to the final factor – whether the court's prior decision was subject to appeal or

was in fact appealed – because the parties have focused their arguments almost exclusively on this factor. The Court turns to these factors with the understanding that no single factor is dispositive.

### a. Appeal

The Court notes at the outset that present appealability of the Rule 1034 Order is but one factor in the Court's assessment of finality. The parties agree that the order of the Commonwealth Court is not presently appealable because the action in which it was entered remains pending. (See Doc. Nos. 77 at 16; 79 at 5-7) (citing Pennsylvania Rule of Appellate Procedure 341). As the Third Circuit explained in Horsehead, in applying New York's preclusion doctrine, the concept of finality as applied by the rules of appellate procedure does not necessarily comport with finality for the purposes of applying the law of preclusion. See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc., 258 F.3d 132, 142-143 (3d Cir. 2001). In Greenleaf, the Third Circuit applied Pennsylvania preclusion law and held that a jury verdict on damages entered in a bifurcated trial was entitled to preclusive effect, even though the verdict lacked immediate appealability. Greenleaf, 174 F.3d at 358-359. The circuit court rejected the district court's application of the Pennsylvania preclusion doctrine to require a final appealable judgement under Section 28(1) of the Restatement (Second) of Judgments. Id. at 359. The circuit court pointed to multiple examples in its own jurisprudence where issue preclusion was proper absent an appealable judgment. Id. at 360-361 (citing Burlington Northern R.R. v. Hyundai Merchant Marine Co., 63 F.3d 1227, 1233 n.8 (3d Cir. 1995); In re Brown, 951 F.2d 564, 569-570 (3d Cir. 1991); and Dyndul v. Dyndul, 620 F.2d 409, 412 & n.8 (3d Cir. 1980)). While declining to outline every instance in which preclusion would apply in the absence of

immediate appealability, the court reiterated that preclusion is necessary to serve the interests of judicial economy and comity. These policies apply here. In the present case, although the NCAA's right to appeal the Commonwealth Court's entry of partial judgment is not available, judicial economy would not be served were this Court to undertake an independent review of the constitutional claims at issue here. The Court is informed that trial on the remaining issues in the state court action is imminent. Following the conclusion of that trial, the matter will be subject to full review by Pennsylvania's appellate courts. A judgment on the constitutional claims from this Court, at this juncture, would unnecessarily interfere with state court proceedings and result in needless duplication.

### b.     Adequately deliberated and firm

The United States Court of Appeals for the Third Circuit directs courts in the application of preclusion principles to consider "the nature of the decision" rendered by the previous adjudicator. Horsehead, 258 F.2d at 142-143 (interpreting the same language, but applying New York law). The Commonwealth Court's order at issue here granted partial judgment on the pleadings and declared that the Endowment Act does not violate the constitutions of the United States or Pennsylvania. (Doc. No. 74-1 at 12-13.) The court retained jurisdiction only over those issues that "do not pertain to the Endowment Act's constitutionality or validity," clearly signaling that the court will not revisit the constitutional claims at issue here. (Id. at 8, 12-13.) While the record does not support any conclusion regarding the Commonwealth Court's "deliberative process," it does plainly show that the Rule 1034 Order is avowedly firm and in no way tentative. The Commonwealth Court's Rule 1034 Order satisfies this prong of issue preclusion analysis.

### c. Parties fully heard

Courts more readily apply issue preclusion when the party against whom preclusion is sought fully presented the merits of its case to the prior adjudicator. Greenleaf, 174 F.3d at 358-59; see also Liggon-Redding v. Am. Sec. Ins. Co., No. 06-0227, 2009 WL 3101068, at *10 (M.D. Pa. Sept. 23, 2009) (holding that a party was not "fully heard" when that party proceeded pro se and lost on procedural grounds in a prior adjudication).

It is clear that the Commonwealth Court order encompasses the very issues now before this Court for decision, and that the NCAA was fully represented before the Commonwealth Court. The NCAA argues that it was not "fully heard," because of the manner in which its constitutional claims were decided. (See Doc. No. 79 at 9-10.) The claims were first raised in the NCAA's preliminary objections, and were considered and rejected by the Commonwealth Court, sitting en banc. Corman v. NCAA, 74 A.3d 1149, 1167-172 (Pa. Commw. Ct. 2013). A single judge of the Commonwealth Court again considered the claims in connection with the state's motion for partial judgment. (Doc. No. 74-1.) Although the court's review is not supported by extensive analysis, the NCAA was afforded a full opportunity to brief the issues. (See Doc. No. 81-2.) Under governing standards, the NCAA was "fully heard."

The Court can find no support for the NCAA's argument that because the constitutional issues arose as a result of the NCAA's preliminary objections the issues were not fully litigated. To the extent that the NCAA is arguing that the Commonwealth Court ruled on matters not before it, these objections are properly the subject of a state court appeal and do not alter this Court's preclusion analysis.

### d. Reasoned opinion

Reasoned supporting opinions reveal whether or not particular issues were actually decided in the prior adjudication, leading subsequent adjudicators to more readily apply issue preclusion in the presence of "thorough and thoughtful opinion[s.]" See In re Docteroff, 133 F.3d 210, 215-216 (3d Cir. 1997) (applying Restatement (Second) of Judgments § 13 in the context of federal preclusion law). Plaintiff points to a number of procedural anomalies that call into question whether the opinion of the Commonwealth Court is a "reasoned opinion" for purposes of preclusion. (Doc. No. 79 at 7-10.) Plaintiff notes that the consideration of its constitutional claims on preliminary objections by an en banc court, before the filing of responsive pleadings, was not consistent with Pennsylvania procedure. (Id. at 9.) The record also reflects that the state defendants' first motion for judgment on the pleadings on the constitutionality of the Endowment Act was considered by the Commonwealth Court en banc and rejected as premature: "The [Commonwealth] Court will not make a legal determination which has such far reaching implications without conducting a hearing on the disputed factual issues."[7] Corman v. NCAA, 93 A.3d 1, 20-21 (Pa. Commw. Ct. 2014) (en banc) (April 9, 2014). Ultimately, two days after the close of briefing on the state parties' motion for judgment on the

---

[7] The Commonwealth Court has issued four relevant orders in this action:
   1 - September 4, 2013: order overruling NCAA's preliminary objections, including those objections based upon the Takings, Contract, and Commerce Clauses of the federal constitution (en banc)
   2 - April 9, 2014: order denying state government's motion for judgment on the pleadings, ruling on NCAA's other constitutional claims not raised in this Court (en banc)
   3 - October 3, 2014: order denying NCAA's motion to dismiss for mootness after the NCAA and Penn State agreed to comply with the Endowment Act (Covey, J.)
   4 - October 31, 2014: Rule 1034 Order granting state government's motion for partial judgment on the pleadings on constitutional issues (Covey, J.)

pleadings, a single judge of the Commonwealth Court granted full relief on the constitutional issues, granting the motion of the state parties that urged the court to put a stop to the NCAA's efforts to accomplish an "endrun" around the state court. (Doc. Nos. 74-1; 81-1 at 9.)

The resulting order of the Commonwealth Court does not provide the court's constitutional analysis, but in effect adopts the reasoning of the en banc Commonwealth Court opinion on preliminary objections. The Commonwealth Court holds the Endowment Act constitutional, and turns its attention to the NCAA's litigation conduct, appearing to credit the state's allegations of "forum shopping." While this approach may have unfortunately served to undermine the NCAA's confidence in the proceedings, it does nothing to obscure the clarity of the Commonwealth Court's ruling.

Though a separate opinion with full reasoning would easily satisfy the "reasoned opinion" prong, the Court cannot say that an opinion that adopts a fully reasoned opinion does not. Based on consideration of the above factors, the Court finds that the Rule 1034 Order is final for the purpose of issue preclusion. The Court notes the NCAA's arguments concerning irregularities in the posture and timing of the Commonwealth Court but finds no legal support for the argument that the judgment is not final as a result of these irregularities. Taken together, the Rule 1034 Order's professed finality, the extent of the NCAA's opportunity to be heard, and the probable availability of an eventual appeal mandate such a result under the preclusion law of Pennsylvania.

    **2.  Full and fair opportunity to litigate**

The Commonwealth Court's Rule 1034 Order is rooted in an earlier constitutionally reasoned opinion that disposed of the NCAA's preliminary objections. The NCAA argues that

because the overruling of preliminary objections is not a "full and fair opportunity to litigate" under Pennsylvania law, issue preclusion does not apply. (Doc. No. 79 at 9-10.) In response, the state government defendants agree that the September 4, 2013 opinion overruling preliminary objections would not be entitled to preclusive effect standing alone, but they maintain that the Rule 1034 Order, which granted judgment on the pleadings, is a final judgment. (Doc. No. 81 at 10-11.) The state government parties also point out that the NCAA had the opportunity to brief the constitutional issues on multiple occasions, so they argue that the NCAA was afforded a full and fair opportunity to litigate. Id.

"What constitutes a full and fair opportunity to litigate an issue can itself be a very complicated determination." In re Ellis' Estate, 333 A.2d 728, 731 (1975). This requirement is a matter of state law, but it is constrained by federal constitutional law; the full and fair opportunity to litigate cannot be found where the underlying state court procedures fell below those required by due process. Kremer, 456 U.S. at 481-482. The "full and fair opportunity to litigate" under Pennsylvania law requires more than the satisfaction of due process. See Murphy v. Duquesne Univ., 777 A.2d 418, 435 (Pa. 2001) (finding full and fair opportunity lacking and not addressing due process); see also Commonwealth Dept. Corr. v. W.C.A.B. (Wagner-Stover), 6 A.3d 603, 611-612 (Pa. Commw. Ct. 2010). Pennsylvania courts considering this question have cited with approval to the Restatement (Second) of Judgments Section 28, holding, for example, that a major corporation did not have the full and fair opportunity to litigate, as required for issue preclusion, because the amount in controversy was much smaller in an earlier worker's compensation action than in the subsequent civil suit. Rue v. K-Mart Corp., 713 A.2d 82, 85-86 (Pa. 1998) (citing Restatement (Second) of Judgments § 28). State courts in

Pennsylvania have found that a litigant had a full and fair opportunity to litigate in prior proceedings where: (1) the litigant-student received notice and an adversarial hearing prior to a final order of expulsion, J.S. v. Bethlehem Area Sch. Dist., 794 A.2d 936, 941 (Pa. Commw. Ct. 2002); and where (2) a previous administrative tribunal made a dispositive fact determination employing adequate procedures, W.C.A.B. (Wagner-Stover), 6 A.3d at 611.  However, Pennsylvania courts have found the full and fair opportunity to litigate lacking where: (1) the litigant was allowed to participate in a parallel action only to join in a request for an injunction and was not allowed to call witnesses, Safeguard Mut. Ins. Co. v. Williams, 345 A.2d 664, 669-70 (1975); (2) a prior administrative action employed starkly different procedural rules and the financial stakes differed, Cohen v. W.C.A.B. (City of Phila.), 909 A.2d 1261, 1270 (Pa. 2006); and (3) where a federal district court previously granted a summary judgment motion that did not directly address at length the distinct legal issue relevant to the subsequent adjudication, Murphy, 777 A.2d at 435.

      The NCAA has already litigated its constitutional claims as fully in Commonwealth Court as it has done before this Court, filing pleadings, motions, and briefs contesting the Endowment Act's constitutionality.  In its present Rule 12(c) motion, the NCAA is sufficiently satisfied with the extent of litigation in the federal forum to conclusively establish the Endowment Act's status under the United States Constitution.  (Doc. No. 59 at 7-8, 10.)  The Court can find no principled distinction between the extent of the NCAA's opportunity to litigate in Commonwealth Court and in this Court, and as a result, the Court finds that the NCAA's opportunity to litigate was sufficiently full in the Commonwealth Court to satisfy Pennsylvania issue preclusion law.  In addition, the Court agrees with Treasurer McCord that the Rule 1034

Order is a separate judgment from the September 4, 2013 en banc Commonwealth Court opinion overruling the NCAA's preliminary objections. Therefore, it is not the NCAA's opportunity to litigate up to September 4, 2013, but rather its opportunity up to October 31, 2014, that controls the question. The Court is satisfied that in the approximately 20 months between the filing of the state court lawsuit and the rendering of the Rule 1034 Order, the NCAA was fully heard on the constitutionality of the Endowment Act. Having found that the Rule 1034 Order is final and having found that the NCAA had the full and fair opportunity to litigate in state court, the Court finds that issue preclusion applies, so the Court cannot re-evaluate the NCAA's constitutional challenges to the Endowment Act.[8]

### III.   CONCLUSION

The federal Full Faith and Credit Act is grounded in principles of comity that do not permit federal district courts to sit as appellate bodies over Pennsylvania courts. While not the model of clarity or procedurally perfect, the Commonwealth Court proceedings satisfy the minimum standards of the law of issue preclusion, and as such are entitled to preclusive effect. This Court is obliged to decline consideration of Plaintiff's constitutional claims.

For the foregoing reasons, the Court will grant Defendants' cross-motion for judgment on the pleadings and the Clerk of Court will close the above-captioned matter. An order consistent with this memorandum follows.

---

[8] The Court finds that the specific constitutional issues raised before this Court have been adjudicated by the Commonwealth Court. Because the Court finds that issue preclusion operates to bar the entirety of the NCAA's facial challenges to the Endowment Act, the Court will not evaluate the applicability of claim preclusion.